UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF E.H., et al.,

        Plaintiffs,

v.                                                    Case No. 21-C-502

MANITOWOC COUNTY, et al.,

        Defendants.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

      This is a tragic case involving three young siblings who, upon being found in need of protection and services due to parental neglect, were placed in the care of relatives who viciously abused them, resulting in trauma to all three children and the death of one. Plaintiffs, including the parents from whose custody the children were removed, have sued Manitowoc County and various employees of its Human Services Department pursuant to 42 U.S.C. § 1983, alleging that the defendants violated the children's rights under the Due Process Clause of the Fourteenth Amendment by placing them with their relatives. The matter is presently before the Court on Defendants' motion to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons explained herein, that motion will be granted.

## RULE 12(b)(6) MOTIONS

      A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint to state a claim upon which relief can be granted. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and draw all inferences in the light most favorable to the non-

moving party. *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir. 1997); *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir. 1991). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a motion to dismiss, the court may also "'take judicial notice of matters of public record' without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (quoting *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)). It is also well settled that, "in deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim.'" *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir.1994)). The court may also consider concededly authentic documents that the plaintiff expressly refers to and relies on in the complaint, to the extent the information contained therein is not contradicted by the allegations of the complaint or disavowed by the plaintiff. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009); *Williamson v. Curran*, 714 F.3d 432, 436–37 (7th Cir. 2013); *Otis v. Demarasse*, 886 F.3d 639, 646–47 (7th Cir. 2018).

## FACTS ALLEGED

The complaint in this case alleges that, in the spring of 2017, A.H., and twins E.H. and A.H., Jr., were taken from the home of their parents, Anthony Hauschultz and Andrea Everett. Compl., Dkt. No. 1, at ¶¶ 35–36. The children had been adjudged to be children in need of protection and services (CHIPS) in a state court proceeding pursuant to Wisconsin law, which authorizes such a finding when parents neglect, refuse, or are unable for reasons other than poverty to provide necessary care so as to seriously endanger their child. Wis. Stat. § 48.13(10).

Dispositional Order Appointing Guardian, Dkt. No. 7-3, ¶ 2. In late spring, Tim Hauschultz, a relative of the family, had expressed an interest in receiving placement of the children in his household. Compl. ¶ 37. Sometime during the summer of 2017, the three children were placed in the custody of Tim Hauschultz and Tina, his wife. *Id.* ¶ 41; Dkt. No. 7-5. Following the placement of the children in their home, Tim and Tina Hauschultz applied for Kinship Care funding through the Manitowoc County Department of Human Services. Compl. ¶ 44. Kinship Care is a state program administered by the counties that provides funds to assist relatives care for children who have been removed from the custody of their parents. Wis. Admin. Code Ch. DCF 58.

In April 2009, some eight years earlier, Tim Hauschultz had been charged with two counts of physical abuse of a child in violation of Wis. Stat. § 948.03(2)(b). In August 2009, he entered a no contest plea and was placed on probation for eighteen months. *Id.* ¶¶ 28–29. Plaintiffs allege this conviction rendered him ineligible for Kinship Care under Wisconsin law. *Id.* ¶¶ 26, 34. Notwithstanding this conviction, the state court presiding over the CHIPS case placed the children with Tim and Tina Hauschultz in July 2017, and some six months later, on January 9, 2018, appointed them guardians over the children. Dkt. Nos. 7-5 & 7-3. Tim's application for Kinship Care was approved by the Manitowoc County Human Services Department in February 2018, retroactive to January 10, 2018. Compl. ¶ 53; Initial Kinship Care Report (Schley Report), Dkt. No. 7-2, at 2.

In early 2018 Social Worker Cindy Schley visited the home of Tim and Tina Hauschultz to determine if they were eligible for Kinship Care payments. Compl. ¶¶ 48–49; Schley Report, Dkt. No. 7-2. In her report, dated February 13, 2018, Schley noted that the children were attending school and doing well. *Id.* at 2. The report states that, "Tim believes in physical labor when the kids are misbehaving." *Id.* He explained that "when they misbehave, they have a lot of extra

energy that needs to be burned productively" and "they must often carry wood or shovel gravel." *Id.* Ms. Schley observed that the children had improved behavior since their placement and she "witnessed them being very respectful to Tim." *Id.* at 3. Schley's report also states that both parents were "currently incarcerated" and "[t]he child's parent is aware of and in approval of the child's living arrangement with the relative." *Id.* at 3, 5. Schley approved the Kinship Care funding shortly after her visit, and her report was approved by supervisor Nancy Randolph. *Id.* at 6; Compl. ¶¶ 52–54.

The complaint alleges that, "[a]fter Manitowoc County and the individual defendants placed E.H., A.H., and A.H., Jr. into Tim and Tina Hauschultz's custody, and after they authorized Tim Hauschultz and his wife Tina Hauschultz for kinship care over E.H., A.H., and A.H., Jr., Tim and Tina Hauschultz exposed E.H., A.H., and A.H., Jr. to horrifying physical and mental abuse." Compl. ¶ 57. The abuse alleged included forcing the children to walk around the backyard carrying a heavy (45 pound) log for hours; forcing them to kneel on gravel while holding ice cubes in their hands and then pouring hot water on their hands; forcing them to kneel on the fireplace; and forcing them to stand for meals and eat malt-o-meal, while other family members were seated at the table and given fully prepared meals. At times, Tim and Tina Hauschultz also directed their son Damian, who was a minor at the time, to torture the children. *Id.* ¶¶ 59–62.

On April 19, 2018, for reasons not before the Court, Tim Hauschultz allegedly decided to punish the children. *Id.* ¶ 64. He forced E.H. and A.H., Jr., to carry a log through the snow for two hours and directed his son Damian to ensure that the children completed their punishment. *Id.* ¶¶ 65–66. When the children struggled with their logs, Damian responded, per his father's instructions, with violence. *Id.* ¶ 68. Damian, who weighed approximately 100 pounds more than E.H. at the time, kicked, punched, and beat E.H. and A.H., Jr., with a stick or belt, striking them

4

so many times with the belt that it broke. *Id.* ¶¶ 69–73. As the other children witnessed, Damian allegedly rolled a log across E.H.'s chest, repeatedly shoved him into the ground, stood on E.H.'s head and body while he was face-down in a puddle, and buried him in approximately 80 pounds of snow, after first removing his coat and boots. *Id.* ¶¶ 73–76, 78. Damian left E.H. completely buried in the snow for approximately 20 to 30 minutes. *Id.* ¶¶ 79–80. When E.H. was removed from the snow, he was making gurgling sounds and was largely unresponsive. *Id.* ¶ 88. Damian then allegedly poured hot water on E.H. to see if he was "faking it," but E.H. was eventually taken to a hospital in critical condition. *Id.* ¶¶ 83–86. He died the next day. *Id.* ¶ 87. Tim and Tina Hauschultz, along with their son Damian, have been charged criminally for their involvement in the abuse of the children and death of E.H.

On the basis of these allegations, Plaintiffs have asserted twenty-one claims for relief against the County, known and unknown employees of its Department of Human Services, and a fictitious liability insurer. The first fifteen claims assert the same due process violation on behalf of the Estate and the two surviving children against each of the five known individual defendants. The remaining claims are derivative of these. In essence, Plaintiffs allege that the individual defendants violated the rights of the children to due process of law by placing them with, and failing to protect them from, Tim Hauschultz and his family.

## ANALYSIS

Plaintiffs' principal claims arise under the Due Process Clause of the Fourteenth Amendment. Plaintiffs allege that, by placing the children with Tim Hauschultz and his family, the County defendants violated the children's right to substantive due process. As a substantive matter, "the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'"

5

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). To prevail on a substantive due process claim, the government conduct at issue must be so egregious that it "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846–48 (1998). Certainly, the conduct alleged of Tim Hauschultz and his family is conscience shocking. The question before the Court, however, is whether the conduct of the County defendants, as alleged in the complaint, meets this standard.

As support for their motion to dismiss, Defendants rely primarily on *DeShaney*, in which the Court held that the County had no constitutional duty to protect a child from his own father where it played no role in creating the danger to the child in the first place. In *DeShaney*, the mother of a child who had been seriously injured by his father filed a civil rights action against the social workers and local officials who had received complaints that the child was being abused by his father but had not removed the child from his father's custody. The authorities had first learned that the child might be a victim of child abuse in January 1982, when his father's second wife complained to police at the time of their divorce that he had previously hit the boy causing marks. The father denied the abuse when interviewed by social workers from the Department of Social Services (DSS), and it was not pursued further. A year later, the child was hospitalized with multiple bruises and abrasions. The examining physician suspected child abuse and notified social services, which obtained an order from a state juvenile court placing the child in the temporary custody of the hospital. A Child Protection Team consisting of a pediatrician, a psychologist, a police detective, the county's lawyer, and several DSS caseworkers reviewed the case and concluded there was insufficient evidence to retain the child in custody. Over the following year, another hospitalization and monthly visits, at which a social worker observed and documented suspicious injuries, did not spur renewed action. Finally, in March 1984, the child was beaten so

6

badly that he fell into a life-threatening coma and sustained permanent brain damage. His father was subsequently tried and convicted of child abuse. 489 U.S. at 192–93.

In her lawsuit against the county employees, the child's mother claimed that, by failing to remove the child from the custody of his father after notice of the abuse, the county and its employees had deprived the child of substantive due process. *Id.* at 193. In affirming the lower courts' dismissal of the petitioner's claim, the Court explained:

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without due process of law, but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression . . . . Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

*Id.* at 195–96 (internal quotations, citations, and brackets omitted).

The Court acknowledged in *DeShaney* that in certain circumstances "when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200 (citing *Estelle v. Gamble*, 429 U.S. 97 (1976); *Youngstown v. Romero*, 457 U.S. 307 (1982)). But that principle did not apply, the Court held, where the harm suffered by the child occurred not while he was in state custody but rather while he was in the custody of his father. *Id.* at 201. The fact that the State had at one time taken custody of the child did not change the analysis, the Court held: "That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than

7

that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* at 201.

The same rule applies, Defendants contend, when the child is placed with a family member without objection by the parents, the state court terminates its dispositional order, and the County's role is reduced to providing funding to the family member who takes on the responsibility for the children. Indeed, in *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir. 1989), the court affirmed the district court's dismissal, on the ground of qualified immunity, of a claim that the public official defendants had violated a child's liberty interest under the due process clause by placing her in the temporary custody of an aunt despite warnings by the child's mother that members of the aunt's household used drugs and had sexually abused children in the past. After being placed in the custody of the aunt, the child was sexually abused on several occasions. *Id.* at 511. In affirming the dismissal, the court distinguished the Second Circuit's decision in *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir. 1981), on the ground that, in that case, the child had been placed in a licensed foster home, rather than with a relative. In light of the Court's holding in *DeShaney* and the Seventh Circuit's decision in *Bobbitt*, Defendants argue the complaint in this case fails to state a claim.

Plaintiffs argue that *DeShaney* does not apply here because the County defendants placed the children in the custody of a known abuser. Instead of *DeShaney*, Plaintiffs contend that this case is governed by *K.H. through Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990). In *K.H.*, the court rejected the qualified immunity defense of the defendant public officials and social workers who were alleged to have placed an abused child in a series of foster homes in which she continued to suffer abuse and was deprived of the special care she required in view of her history. The child sued officials and social workers of the Illinois Department of Children and Family Services

8

(DCFS), contending that they had deprived her of due process by placing her in foster homes that they knew to be either abusive or unable to care for her properly. In rejecting the defendants' defense of qualified immunity, the court noted that, unlike *DeShaney*, this was not a case where the alleged wrong was the failure of the state to protect a child from physical abuse inflicted by the child's own father. *Id.* at 848–49. "Here, in contrast," the court explained, "the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner or the due process clause if he was awaiting trial." *Id.* at 849 (citations omitted). The court thus held that the plaintiff had a viable claim under the Due Process Clause where the defendant social workers placed the child with a foster parent they allegedly knew was incompetent. *Id.* The administrator defendants could also be liable, the court held, even though they did not know of K.H.'s case specifically, because they allegedly knew that "mindless shuttling of the Department's wards among incompetent foster parents was rampant, and indeed had, without justification, formulated and approved the departmental policies that caused such shuttling to occur." *Id.* "If, as the complaint alleges," the court held, "the defendants must have known they were placing K.H. in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present." *Id.* at 850.

*K.H.* does not apply here, however, because there is no allegation that the defendants had any notice that the children were being abused. As *DeShaney* explained, the duty of the State to

9

assume responsibility for a person's safety and general well-being arises when the State takes a person into custody and holds him there. 489 U.S. at 199–200 (citing *Estelle*, 429 U.S. at 103–04; *Youngberg*, 457 U.S. at 317). But even in cases where such a duty arises, a state actor can be liable for injury inflicted by a third person only if the state actor knew of the danger and was deliberately indifferent to it. *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Velez v. Johnson*, 395 F.3d 732, 735 (7th Cir. 2005). Absent knowledge that the children were being abused or at serious risk of abuse, it cannot be said that the defendants violated their right to due process by "deliberately and without justification" placing them in a position of danger. *K.H.*, 914 F.2d at 849; *see also Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 710 (7th Cir. 2002) ("The plaintiffs' focus on the defendants' knowledge of the risk to Timijane would be relevant to the question of 'deliberate indifference.' However, because we conclude that the defendants did not create or increase the risk of suicide by suspending Timijane, we need not reach the question of whether the defendants acted with deliberate indifference, which would be necessary to create constitutional liability.").

The complaint in this case alleges that the physical and mental abuse of the children occurred after the court appointed Tim and Tina Hauschultz as their guardians and after Tim's application for Kinship Care was approved. Compl. ¶ 57. By that time, the juvenile court's dispositional order had been allowed to terminate because the court found "no further need for court involvement." Order Terminating Dispositional Order, Dkt. No. 7-4. And unlike *Bobbitt*, the parents of the children in this case did not object to the placement and warn the defendants that the children would be in danger if placed with their relatives. 881 F.2d at 511. Although Schley's report stated that Tim believed in physical labor as punishment for misbehavior, he did not say he believed in corporal punishment or in striking a child. There is simply no allegation that Schley

or any other defendant saw any evidence that Tim Hauschultz or anyone else was abusing the children. According to the report referenced in the complaint, the behavior of the children had "remarkably improved since being placed at Tim and Tina's." Schley Report, Dkt. No. 7-2, at 3. Schley noted that the kids had chores every day and did their homework/reading right after school. She was able to meet with the children after school and observed their interaction with Tim. She described the home where they lived as "a beautiful, well organized and clean" two-story home located in rural Manitowoc with six bedrooms and three bathrooms. *Id.* Each of the kids had their own bedroom. Given Schley's report and absent any allegation that any of the County defendants were aware the children were being abused, there is no basis upon which they can be found liable for the brutality inflicted on the children by Tim Hauschultz and his family.

Plaintiffs contend that Tim should not have been even considered for Kinship Care because of his prior conviction for child abuse. But that offense, for which he was placed on probation for eighteen months, occurred some nine years earlier. The fact that Tim committed the crime of child abuse nine years earlier does not mean that he was likely to do so again. Conviction for a crime, by itself, does not mean that the same person must be forever considered dangerous to society. A nine-year-old conviction is not sufficient to put the defendants on notice that Tim and his family were likely to harm the children placed in their care. At most, placement with such a person may amount to negligence, but it is not enough to indicate the absence of care or concern sufficient to state a substantive due process claim.

For the reasons set forth above, the complaint fails to state a claim under the Fourteenth Amendment. Plaintiffs' claims for violation of the children's right to substantive due process and the claims derived therefrom thus fail. Defendants' Rule 12(b)(6) motion to dismiss will therefore be granted. In their brief in opposition to Defendants' motion to dismiss, Plaintiffs ask that the

11

Case 1:21-cv-00502-WCG   Filed 11/12/21   Page 11 of 12   Document 14

or any other defendant saw any evidence that Tim Hauschultz or anyone else was abusing the children. According to the report referenced in the complaint, the behavior of the children had "remarkably improved since being placed at Tim and Tina's." Schley Report, Dkt. No. 7-2, at 3. Schley noted that the kids had chores every day and did their homework/reading right after school. She was able to meet with the children after school and observed their interaction with Tim. She described the home where they lived as "a beautiful, well organized and clean" two-story home located in rural Manitowoc with six bedrooms and three bathrooms. *Id.* Each of the kids had their own bedroom. Given Schley's report and absent any allegation that any of the County defendants were aware the children were being abused, there is no basis upon which they can be found liable for the brutality inflicted on the children by Tim Hauschultz and his family.

Plaintiffs contend that Tim should not have been even considered for Kinship Care because of his prior conviction for child abuse. But that offense, for which he was placed on probation for eighteen months, occurred some nine years earlier. The fact that Tim committed the crime of child abuse nine years earlier does not mean that he was likely to do so again. Conviction for a crime, by itself, does not mean that the same person must be forever considered dangerous to society. A nine-year-old conviction is not sufficient to put the defendants on notice that Tim and his family were likely to harm the children placed in their care. At most, placement with such a person may amount to negligence, but it is not enough to indicate the absence of care or concern sufficient to state a substantive due process claim.

For the reasons set forth above, the complaint fails to state a claim under the Fourteenth Amendment. Plaintiffs' claims for violation of the children's right to substantive due process and the claims derived therefrom thus fail. Defendants' Rule 12(b)(6) motion to dismiss will therefore be granted. In their brief in opposition to Defendants' motion to dismiss, Plaintiffs ask that the

Court "enter a scheduling order to provide Plaintiffs with additional time to amend the operative complaint."  Br. in Opp., Dkt. No. 10, at 22.  The Court declines to enter a scheduling order in a case where a valid claim has not yet been stated.  *See Iqbal*, 556 U.S. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  Plaintiffs will instead be allowed twenty-one days to file an amended complaint. In the event they fail to do so, the case will be dismissed with prejudice.

    **SO ORDERED** at Green Bay, Wisconsin this 12th day of November, 2021.

                                            s/ William C. Griesbach
                                            William C. Griesbach
                                            United States District Judge